May it please the court, my name is Francis Fanning and I represent the appellant Nicole Farber in this matter and I hope to be able to save about five minutes for rebuttal. Nicole Farber worked for nine years for the Mesa Police Department as a forensic technician and she had no discipline, no and just very briefly while she was her main job as a forensic technician was to take photographs of crime scenes and other scenes that the police department investigated and in the course of doing that one of the things that she often had to do was take a photograph of someone who had died, someone who had been killed, someone who had committed suicide and this was a challenging I guess and difficult task for her. I think we've got the general factual background of the case, maybe you could just jump to, I'll just tell you where I'm leaning against you right now, pretext okay I just maybe you can just jump to that. Okay I think we've we've raised two issues and there's only one claim out of the very many claims that she made that that is on appeal and that's the title seven sex discrimination claim. Everything else the judge dismissed you know we aren't challenging that but the two issues we raised have to do with the use of comparators and the cap spot theory. The comparator issue Judge Snow rejected as comparators cases of a number of actually one case but it was a number of officers who took these forensic photographs, similar kinds of photographs, pasted them on the wall in a substation. Forensic, they weren't crime scene photographs right? I thought they were just you know we've recovered a gun let's go have a guy take a picture of me holding the gun. Well some of them some of them were what they called trophy photographs where the they would find a gun or they find a motorcycle or something like that and the investigating officers would would pose and have the photograph the photographer photograph them in it. But they weren't all that way. Some of them were were these same kinds of photographs of people who have died or been killed and on the photographs what they did was. Are there three comparators? Three individuals that are comparators? Your Honor, there were a number of police officers it's one investigative case and it begins at page 63 of the excerpts and let's see there's an officer Brian Cochran. I mean there's the guy with the DUI there's the guy who showed the photographs to his wife and then there's these people and I you put aside the trophy photographs. Are there photographs that were put up in this office I'm gathering it was some kind of office thing that were crime scene photographs that had evidentiary value or were they just some guy with a you know disposable camera say hey let me get a picture of you next to this dead body. Well it was one photograph of an obese male subject without a shirt and the officer Gillis wrote on the picture world's largest baby and then another picture of a male subject with a very large growth on his nose. Let me see here. There's one photograph that had the epitaph Marvin B. hypnotized by crack was me. De Bruyn's the last place I'd be. Well Counselor rather than have you just flip through all those pages let me just ask you again do you have or any of those incidents involving crime scene photographs that had evidentiary value like your clients photographs. My understanding is that some of them are not necessarily crime scenes but scenes involving people who had died or committed suicide. And some of these people were known to the police officers and they wrote these little poems and epitaphs on the photograph and put it up on the wall. And one particular thing that I wanted to read from that exhibit is at page 75 of the excerpts. The allegation is Sergeant Kevin Gillis while he was an officer prior to being promoted and on duty neglected his duty by misusing department time by engaging in non-police related activity by posing for a photograph taking a photograph and or contributing content to a photograph or sign wherein a deceased citizen's death and or lifestyle was mocked and or ridiculed. And it says Gillis helped create the epitaph, loved to call Officer Gillis boss, tried to make some transient sauce, the plants were actually strychnine moss now six feet under due to blood loss. That's an example of a crime scene photograph or at least a photograph of a deceased person that was posted on the wall and made fun of. I thought the description there is that Gillis is in the picture. It doesn't, it doesn't indicate. It doesn't indicate that there was any deceased person there other than Gillis. Gillis might be dead from the years up. But other than that, there's nobody else. Your Honor, it's Officer Gillis. I don't care whether it's, yeah, all right. Gillis. We know it's Gillis. And he's there, right? Now, is he deceased? Is he a victim of a crime? Or is there somebody else in the picture? And if there's somebody else in the picture, why isn't it described? My understanding is that at least some of these pictures were pictures that were taken. You keep saying my understanding is that some of them are. Now, which ones are? Well, let me see. The one I mentioned is obviously a deceased person. What's the excerpt of record you're looking at? That's at page 75 of the excerpts. All right. Thank you. Thank you, Your Honor. They're just referred to as photographs of male subject. Where does that get you? I'm sorry? Where does that get you? Well, my understanding from this discipline was that the photographs were taken in the course of the police officers carrying out their investigative duties. And then they were used not for police purposes, but for entertainment purposes, so to speak. These were not shown outside the department, correct? I'm sorry? These are internal to the department. They weren't. There isn't any evidence that they were shown to anybody outside the department. Right. Well, that makes some difference, doesn't it? I'm sorry? I mean, there's a difference between perhaps inappropriate jocularity within the department and with officers who are on the force and showing crime scene photos to someone who's not even in the cone of the police. Well, if there were a specific policy that said, thou shalt not show crime scene photos to people outside the department, then that would be the case. But the policies that Ms. Farber was accused of violating involved misuse of evidence, appropriation of evidence, and things that would just as easily apply to the use that the police officers made of these photographs. There wasn't a specific policy that said that these photographs couldn't ever be shown outside the department. And, in fact, she argued unsuccessfully that the photographs would be subject to the public records statute in Arizona, that somebody who wanted to look at them could obtain them through a public records request. And one of the things about photographs is that they're different from other forms of evidence in that they're evidence that's created after the fact and they're used demonstratively, so they qualify as evidence but not in the same sense as a gun or some drugs or something like that. And they really can't be appropriated because, with technology the way it is, the police department has the photograph. If she takes a copy of the digital photograph and puts it on her thumb drive, which is my understanding of what she did, she puts it on her thumb drive, she puts it on her own computer and saves it, there is no real appropriation in the sense that the police department doesn't lose the benefit of it. Sotomayor, you know, trade secrets misappropriation or any kind of misappropriation, if I unlawfully take a copy of something, and even though I leave the thing there, the original, I still may have misappropriated the information, so I'm not quite sure how that saves her. I mean, that definition of misappropriation would stretch any dictionary. I guess what I'm saying is that the police department isn't deprived of the use of the photograph. The investigation or the prosecution is not compromised in any way by the fact that she also has a picture of the same photograph. And so calling it an appropriation, I mean, it's almost like saying it's a trade secret or something, but it's not. It's a public record. Do you want to save some remaining time? Yeah, I just wanted to mention one other thing, and if I run out of time, I do. And that has to do with the cat's claw theory. And the record shows that when this case went from Officer Van Galder to the city's personnel board, Van Galder's exact same allegations against Ms. Farber were systematically upheld. And I didn't cite this case in my opening brief because it actually is a Ninth Circuit case that predates the Staub case. And when I saw the Staub case, I just used that as the sort of the definitive statement about cat's claw. But the Ninth Circuit in Poland v. Chertoff, and it's 494 F. 3rd, 1174, talked about what constitutes evidence of this cat's claw effect. And the case says, We hold that if a subordinate, in this case it would be Van Galder, Van Galder, in response to a plaintiff's protected activity, this was a retaliation case, that's why they're mentioning that, sets in motion a proceeding by an independent decision-maker that leads to an adverse employment action. The subordinate's bias is imputed to the employer if the plaintiff can prove that the allegedly independent adverse employment decision was not actually independent because the biased subordinate influenced what was involved in the decision or the decision-making process. And Mr. Van Galder, or Sergeant Van Galder, was involved from the beginning to the end. He's the only one that really did an independent investigation. I will reserve the rest of my time. Thank you. Ms. Gagne. Good morning, Your Honors. May it please the Court. My name is Jacqueline Gagne, and I represent the City of Mesa. Here's the problem with this case, and I think appellant's counsel said several times, my understanding, my understanding. The problem is there's no evidence in this case as to, really, to do a valid compare and contrast between the bike officers and Ms. Farber's conduct. What was put forward was a purported report that discussed a number of officers and what they did, and it's very questionable whether that report in and of itself would be admissible as necessary on a summary judgment motion under Rule 56. Setting that aside, however, what is presented and what there is not enough. One, it is, there was no evidence. No depositions were taken. This case went on for about a year in the discovery phase, and Ms. Farber took no depositions and got no testimony from these other officers as to how they obtained these photographs, were they from crime scenes, what they did. There was no evidence presented or depositions taken of the supervisors of the bike officers to find out what the discipline was, what went on during the investigation, and what all the facts were. What we do know are two things that are clearly distinguishable and that make the conduct not sufficiently comparable to get a palant over that hump to avoid summary judgment, and that's, one, that the photographs of the bike officers, there was no evidence presented that those were purposely distributed to members outside of the department for non-work reasons, and that is undisputed in this case, that Farber purposefully not only maintained and took thousands and thousands of these photographs and was keeping them at her home for no work-related purpose in violation of multiple police department policies, but she gave those out to a non-department employee who then gave them to her husband, and they were shown to a friend, and that is a significant difference. That was a huge violation of the department's policies, the department's trust, and the public's trust. Keep in mind, we're talking about extraordinarily graphic, horrific images, many from suicides, and those are private images. The argument that these are public records really doesn't get Ms. Farber anywhere. While they may be public records under the Arizona law, that doesn't mean they're automatically subject to disclosure, and in fact, they would not have been subject to disclosure because Arizona law does recognize that there is a difference when there are privacy interests at issue, and in this case, those death-suicide photographs of these victims and their victims' families, the privacy interests would have outweighed the public's need to know, and so to say that, well, they would have been given out as public records is not the case, and it's not established in the record. As to the catpaw theory that Ms. Farber's counsel presents, this is really not a catpaw case. I'm not familiar with the Owen case that wasn't cited in the brief, but going on the Staub case that was cited in Ms. Farber's brief, Staub is a very well-known case in Arizona, and it was a case in which the plaintiff's lawyers there specifically came out and targeted the plaintiff because of his military obligations, and there were statements made specifically as to wanting to get rid of him and the burden and the strain that his military obligations were putting on the department and making him pay for going and serving in the military and doing those things under USERRA, and that the issue there was he was a violation of USERRA. Was he terminated because of that? And there was also evidence in the Staub case that the supervisors may have fabricated some violations of policy in order to get rid of him. That is a far different case than what happened here. Sergeant Van Galder did not target Ms. Farber. He didn't seek her out. The police department received a complaint from a citizen, the husband of the woman who initially was given the photographs by Ms. Farber, received a complaint, and he was complaining about the fact that these photographs were being passed around and their content. And he brought that. The complaint was made. It was brought to supervisors within the forensics department, and when they looked at Ms. Farber's laptop and determined the number of photographs that should not be there, they figured out that the scope of this conduct with these photographs was much larger, at which point they turned it over to internal affairs, and Sergeant Van Galder was assigned the case. I guess I understand, though, why she sued, because this is somebody who up until this point had no record of discipline. I mean, I think maybe you would agree that perhaps she violated department policies, perhaps she committed misconduct, but it didn't sound like she even really was aware of how serious the transgression had been. And I don't know. It just seems that outright termination with no prior warning, no chance to kind of redeem yourself, it just seemed a little excessive. And I understand why she would have felt, hey, maybe, you know, maybe they've let other people off easier, because this seems kind of harsh. Maybe you could just address that. I share several points to that. Number one, in addition to the conduct with the photographs, which I might add here, that's all undisputed. There's no factual dispute as to what happened. In addition to that, it was also determined that she was dishonest during the investigation, either in the department's definition of dishonesty being providing either false, misleading, or inconsistent statements during the investigation. That is the second substantial difference between the, what was presented about these bike officers and Ms. Farber. So there was that element as well, which the department, that always raises everything to a higher level when you're dealing with a police department, the honesty and the integrity issue. It's, I'm not sure that the record supports that she was unaware that this was that big of a deal, because there is evidence in the record that she told Melissa, don't tell anybody that I'm showing you these photographs, because Sergeant VanGalder's testimony is that she said, or I'm sorry, Melissa's statement to Sergeant VanGalder was, she told me, don't tell anybody, because I could get fired. And she backpedaled on that a little bit when she talked to Sergeant VanGalder and when she testified before the citizen board. She said, no, I didn't say I could get fired. I just said I'd make it in trouble. Well, she clearly knew that she was doing something that she wasn't supposed to be doing with those photographs. At this point, I believe I have addressed all of the main points that I wanted to make. If your honors have no further questions, the city would ask that you uphold the district court's grant of summary judgment in favor of the city of Mesa. Thank you. Thank you. Do you have some rebuttal time, Mr. Fanning? Just a couple of very quick points. First of all, Judge Snow did not reject this evidence because it wasn't admissible. This particular evidence of the photographs, the comparable photograph violations, he analyzed and said it wasn't a good comparison. The other points I want to make is, even though there were a large number of photographs, Ms. Farber said that she was saving them and dealing with the emotional aspects of having to do this kind of work. She only showed a small number to her friend, and it was a friend. She didn't post them on the Internet or do anything that drastic. She did not ridicule the people that were involved in the photographs. The whole cat's paw thing has to do with where the bias would be. And our contention is that the bias was at the bottom level, where the male police officers were treated more favorably than the female. And the issue of Ms. Farber's dishonesty was really a matter of ambiguous answers to questions during an intensive investigation. An investigator who wants to elicit questionable responses can pretty easily find an item or two and say, well, you didn't tell me this, or you told me it differently, and Sergeant Van Galder, I guess, just chose to believe anybody who disagreed with Ms. Farber. So based on that, I would hope that the Court would reverse. Thank you. Thank you. I thank both counsel for your argument this morning. The case argued, Farber v. Mesa, is submitted and will adjourn for the morning. Thank you.
judges: Duffy, McKeown, Watford